NB:TMS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

M-10  583

UNITED STATES OF AMERICA

    - against -

JAMES BROWN,

           Defendant.

- - - - - - - - - - - - - - - - - -x

AFFIDAVIT IN SUPPORT OF
REMOVAL TO THE DISTRICT
OF NEW JERSEY

(Fed. R. Crim. P. 5(c))

EASTERN DISTRICT OF NEW YORK, SS:

       MICHAEL MIGLIACCIO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

       Upon information and belief, on May 11, 2010, an arrest warrant was issued by the United States District Court for the District of New Jersey, commanding the arrest of the defendant JAMES BROWN, for Conspiracy to Receive Stolen Property and to Traffic in Contraband Cigarettes, Transportation of Stolen Goods and Aiding and Abetting, in Violation of Title 18, United States Code, Sections 371, 2314 and 2.

       The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the sole purpose of this affidavit is to establish probable cause to believe that this defendant is the same person charged in the attached complaint and arrest warrant, I have not set forth a description of all the facts and circumstances of

1.    On May 11, 2010, an arrest warrant was issued by
the United States District Court for the District of New Jersey,
commanding the arrest of the defendant JAMES BROWN, for
Conspiracy to Receive Stolen Property and to Traffic in
Contraband Cigarettes, Transportation of Stolen Goods and Aiding
and Abetting, in Violation of Title 18, United States Code,
Sections 371, 23145 and 2.   The arrest warrant was issued by the
Honorable Karen M. Williams, United States Magistrate Judge from
the District of New Jersey.   A copy of the criminal complaint and
arrest warrant is attached hereto.

2.    A records check of the name, social security
number, and date of birth for the defendant revealed an address
at 115B Poospatuck Lane, Mastic, New York.   We were also provided
with a photograph of JAMES BROWN.

3.    On May 20, 2010, I responded to Poospatuck Lane,
Mastic, to attempt to execute the attached arrest warrant.   Once
I arrived at Poospatuck Lane, I knocked on the door of a home
which matched the description provided by a co-defendant believed
to be the building located at 115B Poospatuck Lane, Mastic, New
York.   The building is a two-story structure, with retail space
on the first floor, and stairs leading to a second story.   We
went to the second story and knocked on the door.   An adult
female answered the door.   When asked, the female advised me that
JAMES BROWN did not reside there.   As we were leaving, an

_____

which I am aware.

individual on the street approached me.

4.    I identified myself to the individual and asked him for identification.  The person provided his driver's license, which bore the name JAMES BROWN and the address 115B Poospatuck Lane, Mastic, New York.  The defendant also identified himself as JAMES BROWN.  I compared JAMES BROWN with the picture on the driver's license in the name of JAMES BROWN, and they appear to be the same person.  I then placed the defendant under arrest.

6.    It is the desire of the United States Attorney for the District of New Jersey that the defendant JAMES BROWN be removed to that district for prosecution.

WHEREFORE, it is requested that the defendant JAMES BROWN be removed to the District of New Jersey so that he may be dealt with according to law.

MICHAEL MIGLIACCIO
Special Agent, FBI

Sworn to before me this
21st day of May, 2010

THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   10-5578 (KMW) |
| JAMES BROWN | ) | |
| *Defendant* | ) | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     JAMES BROWN                                                                                                ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment          ☐ Superseding Indictment          ☐ Information          ☐ Superseding Information          ☑ Complaint
☐ Probation Violation Petition          ☐ Supervised Release Violation Petition          ☐ Violation Notice          ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 371 - conspiracy to receive stolen property and to traffic in contraband cigarettes; and
18 U.S.C. § 2314 - transportation of stolen goods
18 U.S.C. § 2 - aiding and abetting

Date:     5/11/10

City and state:     Camden, New Jersey

*Issuing officer's signature*

Karen M. Williams, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                                          _____<br>*Arresting officer's signature* |
|                                          _____<br>*Printed name and title* |

AO 442 (Rev. 01/09)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:    JAMES BROWN

Known aliases:    Jay Brown, Sanchez Brown

Last known residence:    115B Poospatuck Lane, Mastic, NY

Prior addresses to which defendant/offender may still have ties:    15 Knapp Street, Mastic Beach, New York

Last known employment:

Last known telephone numbers:

Place of birth:

Date of birth:    02/08/1980

Social Security number:    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

Height:    5'08"                                      Weight:    145

Sex:    male                                          Race:    black

Hair:    brown                                        Eyes:    hazel

Scars, tattoos, other distinguishing marks:    scar left cheek

History of violence, weapons, drug use:

Known family, friends, and other associates *(name, relation, address, phone number)*:

FBI number:    18116MB9 (NY 9367705J, VA 1381109M)

Complete description of auto:

Investigative agency and address:    Federal Bureau of Investigation, Newark Division, Atlantic City Resident Agency

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*:

AO 91 (Rev. 01/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

ORIGINAL FILED
MAY 1 1 2010
WILLIAM T. WALSH, CLERK

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| JAMES BROWN | ) | Case No.  10-5578 (KMW) |
| | ) | |
| | ) | |
| _Defendant_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of _____ in the county of ____Atlantic____ in the _____ District of
____New Jersey____ , the defendant violated __18__ U. S. C. § _371, 2314_ , an offense described as follows:

See Attachment A
18 U.S.C. § 371 - conspiracy to receive stolen property and to traffic in contraband cigarettes; and
18 U.S.C. § 2314 - transportation of stolen goods
18 U.S.C. § 2 - aiding and abetting

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

_____, FBI
_Complainant's signature_

Mark R. Hindle, Federal Bureau of Investigation
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __5/11/10__

_____
_Judge's signature_

City and state: _____Camden, New Jersey_____

Karen M. Williams, U.S. Magistrate Judge
_Printed name and title_

Attachment A

## COUNT 1

1.      From on or about January 8, 2009 through on or about March 11, 2010, in Atlantic County, in the District of New Jersey, and elsewhere, defendants

JESSE WATKINS,
CLAYTON ATKINSON,
JAMES BROWN, and
XAVIER RAY

did knowingly and intentionally conspire and agree with each other and with others to commit offenses against the United States, to wit:

      a.      to receive, possess, conceal, store, barter, sell and dispose of goods, that is cigarettes, having a value of $5,000 or more, which had crossed a State boundary after being stolen, unlawfully converted and taken, knowing the same to have been stolen, unlawfully converted and taken, contrary to Title 18, United States Code, Section 2315 and Section 21; and

      b.      to ship, transport, receive, possess, sell, distribute, and purchase contraband cigarettes, contrary to Title 18, United States Code, Sections 2342 and 2344.

## OVERT ACTS

2.      In furtherance of the conspiracy and in order to effect its objects, defendants JESSE WATKINS, CLAYTON ATKINSON, JAMES BROWN and XAVIER RAY and their conspirators committed and caused to be committed the following overt acts, among others, in the District of New Jersey and elsewhere:

      a.      On or about January 8, 2009, in Atlantic City, New Jersey, defendants JESSE WATKINS, CLAYTON ATKINSON, and JAMES BROWN purchased approximately 10 cases of stolen cigarettes, which did not have tax stamps, from an undercover law enforcement officer in exchange for cash;

      b.      On or about July 10, 2009, in Fairfax, Virginia, defendants JESSE WATKINS, CLAYTON ATKINSON, and XAVIER RAY purchased approximately 98 cases of stolen cigarettes, which did not have tax stamps, from an undercover law enforcement officer in exchange for cash and a Mercedes Benz automobile;

    c.       On or about September 14, 2009, in Egg Harbor Township, New Jersey, defendants JESSE WATKINS, CLAYTON ATKINSON, and XAVIER RAY purchased approximately 202 cases of stolen cigarettes, which did not have tax stamps, from an undercover law enforcement officer in exchange for cash;

    d.       On or about November 10, 2009, in Egg Harbor Township, New Jersey, defendants JESSE WATKINS, CLAYTON ATKINSON, JAMES BROWN and XAVIER RAY purchased approximately 108 cases of stolen cigarettes, which did not have tax stamps, from an undercover law enforcement officer in exchange for cash and a Chevrolet Tahoe; and

    e.       On or about March 19, 2010, in Buena, New Jersey, defendant JESSE WATKINS purchased approximately 119 cases of stolen cigarettes, which did not have tax stamps, from an undercover law enforcement officer in exchange for cash.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2

Between in or about January 8, 2009, and on or about March 11, 2010, in the District of New Jersey and elsewhere, defendants

JESSE WATKINS,
CLAYTON ATKINSON,
JAMES BROWN, and
XAVIER RAY

did unlawfully transport, and aid and abet the transportation, in interstate commerce stolen goods, wares, and merchandise, that is cigarettes, of a value of $5,000 or more, knowing the same to have been stolen, in violation of Title 18, United States Code, Sections 2314 and Section 21, and Title 18, United States Code, Section 2.

# ATTACHMENT B
## COMPLAINT AFFIDAVIT

I, Mark R. Hindle, Special Agent with the Federal Bureau of Investigation ("FBI"), have knowledge of the following facts based on my own investigation and upon conversations with other individuals involved in this investigation.  I have not included all of the facts known to me in this affidavit, just those facts which I believe necessary to establish probable cause.  Where I assert that an event occurred on a particular date, I am asserting the event occurred on or about the date alleged.  Where the contents of statements and conversations of others are set forth in this Affidavit, they are set forth in substance and in part, except where otherwise indicated:

1.      I have been employed as a FBI Special Agent for approximately 11 years, and I am currently assigned to the Atlantic City Resident Agency of the Newark Division, located in Northfield, New Jersey, where I investigate violations of federal law, including organized crime, white collar crime, public corruption, violent crimes, and narcotics violations.

2.      During the course of this investigation, undercover federal law enforcement officers ("UCs") have posed as individuals involved in a variety of illegal activities, including selling stolen and contraband cigarettes and counterfeit goods.

3.      On or about January 8, 2009, defendant JESSE WATKINS (hereafter "WATKINS"), defendant CLAYTON ATKINSON (hereafter "ATKINSON"), and JAMES BROWN (hereafter "BROWN") traveled to Atlantic City, New Jersey and met with undercover law enforcement agents (hereafter UC#1, UC#2, and UC#3).

4.      On or about January 8, 2009, WATKINS, ATKINSON and BROWN met UC#1, UC#2, and UC#3 at an undercover location in Atlantic City, New Jersey.   WATKINS, ATKINSON and BROWN arrived at the meeting driving a Cadillac Escalade with New York license plate CER5021. During the meeting, which was consensually recorded, the UCs and the defendants discussed, among other things, the sale of cigarettes, which were stolen outside the

state of New Jersey, to the defendants, who were from the state of New York. The conversation included a discussion regarding the theft of cigarettes, what amounts and types of cigarettes the defendants would prefer, and what actions should be taken to avoid law enforcement detection, including the use of false bills of lading when transporting the stolen cigarettes. During the conversation, UC#3 told ATKINSON that "the problem with that though, dude, is that, you know, I'm not the one that's actually going in the frickin' warehouses and shit and frickin' stealing the shit."

5.      On or about January 8, 2009, ATKINSON directed UC#2 and UC#3 to load 10 cases of cigarettes into a Cadillac Escalade with New York license plate CER5021. After the cigarettes were loaded WATKINS gave UC#2 a black bag containing approximately $13,130 as payment for the 10 cases of cigarettes.

6.      On or about January 29, 2009, WATKINS and ATKINSON met with UC#2 in Fairfax, Virginia. During the meeting, which was consensually recorded, UC#2 provided WATKINS with keys to a U-Haul trailer that was pre-loaded with 100 cases of cigarettes. WATKINS took the keys to the trailer and gave UC#2 a bag that contained $126,000.

7.      On or about July 10, 2009, WATKINS, ATKINSON, and XAVIER RAY (hereafter "RAY") met with UC#2 in Fairfax, Virginia. During the meeting, which was consensually recorded, UC#2 provided WATKINS with keys to a U-Haul truck that was pre-loaded with 98 cases of cigarettes. WATKINS took possession of the U-Haul and gave UC#2 the title to a 2007 Mercedes Benz. The Mercedes Benz was registered to Ernestine Watkins, Mastic, New York. WATKINS also gave UC#2 a list of cigarettes that WATKINS wanted in the future. During the transaction, UC#2 gave RAY a fictitious bill of lading for the

cigarettes. UC#2 told RAY to give the police the bill of lading if he was stopped. WATKINS and ATKINSON then got into a 2007 Cadillac and departed the area, while RAY got into the U-Haul and left. After the defendants left UC#2 looked into the Mercedes Benz behind the front seat and found a red Cartier bag containing $85,680.

8.      On or about September 14, 2009, UC#2 and another undercover law enforcement officer ("UC#4") met WATKINS, ATKINSON and RAY in Egg Harbor Township, New Jersey. ATKINSON and RAY arrived in a 26-foot U-Haul truck. WATKINS arrived in a green Ford Expedition with New York registration EMX6981. During the meeting, which was consensually recorded, WATKINS, ATKINSON and RAY along with the UCs, loaded approximately 202.5 cases of cigarettes into the U-Haul. The U-Haul vehicle had been rented by WATKINS. While loading the cases of cigarettes, UC#2 and WATKINS discussed UC#2's difficulty with supplying additional Parliament type cigarettes because the guy that stole them for UC#2 in the past could not currently steal them. Once the truck was loaded, WATKINS provided UC#2 a plastic bag containing a large Cheezit crackers box which contained a large sum of money. Once WATKINS gave the UC the money, he and ATKINSON left in the Ford Expedition. The contents of the box were later counted and it was determined that the box contained $267,300, of which $120 was determined to be counterfeit.

9.      On or about November 10, 2009, UC#2 met ATKINSON, BROWN and RAY in Egg Harbor Township, New Jersey. ATKINSON arrived in a white Cadillac Escalade with a New York registration CER5021. An unknown male then arrived driving a white cargo van with New York registration. BROWN arrived in a Cadillac sedan with New York registration ERZ5802. RAY arrived in a white cargo van. During the meeting, which was consensually

recorded, UC#1 discussed with ATKINSON contraband cigarettes, stealing cigarettes from the

military, an associate of ATKINSON getting arrested, precautions ATKINSON takes in

transporting the cigarettes, swapping a car for cigarettes, and the buy money for the cigarettes

being in the Escalade.  Specifically, UC#1 told ATKINSON to "tell your dad . . . the military is

having an inventory down there . . . . Until it's done we can't get anything out. . . .We can't back

door that shit out. . . . As soon as the inventory is over flood gates are gonna be open."

ATKINSON then asked UC#1 "are we gonna be able to get Paliaments again?"  During the

conversation, ATKINSON told the UC#1 that "if we got over two hundred and . . . we could use

as many as . . . but I could guarantee the green ones, that turnover is gonna be crazy."

ATKINSON then added that "Marlboro ain't got shit on the people I could sell the Newports too.

Nothing.  I could fuck fifty cases on one person. . . . With one person.  One phone call.  Be right

there."   After the initial discussions, ATKINSON, BROWN, RAY, an unknown male, and

UC#1 proceeded to another location and loaded 108 cases of cigarettes into the two cargo vans.

As payment for the cigarettes, UC#1 was provided a dark plastic bag that contained $119,190.

10.    On or about December 9, 2009, WATKINS and ATKINSON met with UC#1,

which was consensually recorded, and delivered a 2007 Chevrolet Tahoe to UC#1 in Atlantic

City, New Jersey.  The 2007 Chevrolet Tahoe was an additional payment for the cigarettes that

were received during the November 10, 2009 transaction (described in paragraph 9).  Following

transfer of the vehicle, UC#1, WATKINS and ATKINSON had dinner and discussed, among

other things, possible future dealings with counterfeit goods, contraband cigarettes, stolen cars

and money laundering.

11.    On or about December 11, 2009, UC#1 met with WATKINS, ATKINSON and

RAY in Buena, New Jersey. During the meeting, which was consensually recorded, UC#1 provided WATKINS, ATKINSON, and RAY with 120 cases of cigarettes. The cigarettes were loaded into a Budget rental truck with Oklahoma license plate 2JR642. UC#1 discussed with WATKINS and ATKINSON, in substance and in part, the selling of counterfeit Nike shoes, contraband cigarettes and the possibility of WATKINS and ATKINSON providing UC#1 with stolen vehicles. UC#1 also gave WATKINS eight pairs of counterfeit Nike shoes and RAY one pair of counterfeit Nike shoes. As payment for the cigarettes, WATKINS gave UC#1 a backpack with $172,859, of which $120 was determined to be counterfeit.

12.    On or about January 7, 2010, UC#1 met with WATKINS and RAY and two other males that worked for WATKINS in Buena, New Jersey. During the meeting, which was consensually recorded, UC#1 provided WATKINS and RAY, along with the other males, 122 cases of cigarettes. The cigarettes were loaded into a white Dodge van and a trailer with New York license plate AS30498 that was being towed by a 2008 F-350 truck with New York license plate 55744JZ. As payment for the cigarettes, WATKINS provided UC#1 with a large plastic bag that contained $181,680.  While the cigarettes were being loaded in the van and on the trailer, UC#1 and WATKINS discussed the types of cigarettes WATKINS preferred to receive during future transactions and various ways to avoid law enforcement detection while setting up email accounts for future communications between UC#1 and WATKINS. During the conversation about establishing an email account UC#1 stated that "the key thing is you know they ask you for a name and stuff and date of birth, you make that stuff up." WATKINS replied "yeah, oh of course."

13.    On or about March 11, 2010, UC#1 met with WATKINS and four other males in

Buena, New Jersey. During the meeting, which was consensually recorded, UC#1 provided WATKINS and four other males with 119 cases of cigarettes. The cigarettes were loaded in a trailer with New York license plate AS30498 that was being towed by a 2008 F-350 truck with New York license plate 55744JZ. As payment for the cigarettes, WATKINS provided UC#1 with a plastic bag that contained $162,860. During the meeting, UC#1 and WATKINS discussed WATKINS' recent pick-up of money from individuals to whom he supplied cigarettes, future purchases of counterfeit cigarettes from China and stolen cigarettes, and money laundering. During these discussions, UC#1 informed WATKINS that there was a possibility of importing a container load of counterfeit cigarettes from China. In response, WATKINS told UC#1 to "get the whole container." When asked how soon he would be ready for the counterfeit cigarettes, WATKINS responded "give me two days I'll call on that because I gotta ask other people." When UC#1 discussed the quality of the counterfeit cigarettes, WATKINS advised that "well that shit always crap. No, no, but so far, once-in-a-while, when I run out . . . the guy I, I, I buy a couple of cases of those . . . I buy a couple because those are really illegal. But I'll buy a couple of cases just to hold me over. . . ." UC#1 responded to that by saying "well, it's all illegal . . . if it doesn't have tax stamps." WATKINS agreed by saying "yeah." WATKINS then opined that "that shit get you in-a-lot-of-trouble. But anyway um, yeah, I buy a couple. The red smokes good. The whites, I'm a be honest. Stay away from them. . . . Because, cause, ah, ah, the reds I sell. I don't have that much of a problem. The whites, I mean . . . you, you . . . you, you'll loose friends cause . . ."

14. None of the packages of cigarettes purchased by WATKINS, ATKINSON and BROWN and RAY had tax stamps affixed to them.